# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| DENISE RENEE SITO, | ) | CASE NO. 3:17CV01979 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Denise Renee Sito, ("Plaintiff" or "Sito"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq.* ("Act").  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In December 2011, Sito filed applications for POD and DIB, alleging a disability onset

date of March 1, 2007, and claiming she was disabled due to diverticulitis, back/neck problems,

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

foot problems, and depression.  (Transcript ("Tr.") 216, 252.)  The applications were denied

initially and upon reconsideration, and Sito requested a hearing before an administrative law

judge ("ALJ").  (Tr. 112, 120, 127.)

On January 29, 2014, an ALJ held a hearing, during which Sito, represented by counsel,

and an impartial vocational expert ("VE") testified.  (Tr. 57-81.)  A second hearing was held,

before a different ALJ, on June 4, 2014.  (Tr. 29-56.)  Sito and an impartial VE testified.  (*Id.*)

On June 13, 2014, the second ALJ issued a written decision finding Sito was not disabled.  (Tr.

13-28.)  The ALJ's decision became final on October 5, 2015, when the Appeals Council

declined further review.  (Tr. 1.)

Sito appealed the decision to this Court.  *See Sito v. Comm'r of Soc. Sec.*, 229 F.Supp.3d

633 (N.D. Ohio Jan. 17, 2017).  On January 17, 2017, Magistrate Judge William H. Baughman

issued a Memorandum Opinion & Order reversing the June 2014 ALJ decision and remanding

for further proceedings consistent with his Opinion.  *Id.* at 638.

Thereafter, the Appeals Council vacated the June 2014 ALJ decision and remanded it for

further proceedings consistent with Magistrate Baughman's Opinion & Order.  (Tr. 726.)  On

July 19, 2017, an ALJ issued a written decision finding Sito was not disabled.  (Tr. 654-672.)

The ALJ's decision became final on September 19, 2017, 61 days after the issuance of the ALJ

decision.  (Tr. 652.)

On September 20, 2017, Sito filed her Complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 16, 17.)

Sito asserts the following assignment of error:

> (1) The RFC determination is unsupported by substantial evidence, because the
> ALJ failed to properly weigh the opinions of Plaintiff's treating physician, Dr.

2

Kanney, resulting in a failure to properly evaluate Plaintiff's severe physical impairments.

(2) The ALJ failed to weigh and explain the weight accorded to the opinion of consultative examiner, Dr. Shamburg, rendering the ALJ's mental capacity assessment unsupported by substantial evidence.

(Doc. No. 15.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Sito was born in August 1965 and was 46 years-old at the time of her date last insured ("DLI"), making her a "younger person" under social security regulations.  (Tr. 665.)  *See* 20 C.F.R. §§ 404.1563(c).  She has a high school education and is able to communicate in English.  (Tr. 665.)  She has past relevant work as a small parts assembler.  (Tr. 664.)

### B.    Medical Evidence[2]

#### a. evidence prior to alleged onset date of March 1, 2007

On April 6, 2005, Sito began a course of physical therapy for "arthralgia" and "myalgia."  (Tr. 337.)  During her evaluation with physical therapist Charlene Mitschelen, PT, Sito reported pain in her neck, chest, calves, and feet.  (Tr. 342.)  She described arm numbness, as well as numbness from her hips to her knees when she sat.  (*Id*.)  She indicated she wore orthotics and had a history of back injuries.  (*Id*.)  On examination, Sito was ambulating independently without

---

[2]    The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the Parties' Briefs.  The Court further notes Sito has cited generally to large swaths of evidence in her Brief, totaling over 120 pages.  (Doc. No. 15 at 6.)  This does not comply with the Court's Order, which specifically provides the brief "shall cite, by exact and specific transcript page number, the pages relating" to the facts at issue.  (Doc. No. 5 at 3.)  Thus, the Court will only discuss evidence which has been cited by the parties with specificity, as required by this Court's Order.

3

an assistive device, had tenderness in her cervical and lumbar spine, decreased range of motion in her cervical and lumbar spine, and her upper extremity range of motion was within functional limits.  (*Id*.)  She had positive bilateral straight leg raises and slightly decreased strength in her lower extremities.  (Tr. 343.)

In April 2005, Sito attended four physical therapy sessions.  (Tr. 339.)  During the sessions, she described hip pain with shoulder and chest tightness.  (Tr. 341.)  By her third session, she calf soreness, but was "feeling better everywhere else."  (*Id*.)

On April 12, 2005, her treating physician, Dr. Sayed, authorized additional physical therapy sessions.  (Tr. 347.)  He listed her diagnosis as "myalgia."  (*Id*.)  Sito then participated in five aquatic therapy sessions.  (Tr. 353.)  On May 11, 2005, she was "feeling significantly better than when she started" therapy.  (Tr. 356.)  On May 12, 2005, physical therapist Mitschelen discharged Sito to a home exercise program.  (Tr. 354.)  Sito had decreased pain, improved sleep, and was working up to seven hours at a time.  (*Id*.)

On December 13, 2005, Sito presented to the Maumee Valley Guidance Center for a psychiatric evaluation with nurse practitioner Barbara Florke, CNS.  (Tr. 361.)  During the evaluation, Sito had a blunted affect and was slightly anxious.  (Tr. 363.)  She indicated she was depressed 50% of the time and had a recent increase in crying episodes.  (*Id*.)  Her concentration was normal and she denied panic attacks.  (*Id*.)  Ms. Florke diagnosed Sito with depressive disorder and assessed a Global Assessment of Functioning ("GAF") Score of 50.[3]  (*Id*.)  She

---

[3]    The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its

prescribed Lexapro.  (*Id.*)

Sito returned to Ms. Florke on March 14, 2006, indicating positive results from her Lexapro and Ativan.  (Tr. 366.)  She reported nightmares after three weeks of taking the medications, but "in general feels [her] mood is much better."  (*Id.*)  Her concentration was normal and her anxiety had decreased.  (*Id.*)  Ms. Florke attributed the nightmares to some recent labwork Sito had undergone, which revealed elevated liver enzymes and high cholesterol.  (*Id.*)

### *b. evidence from alleged onset date of March 1, 2007 through the DLI of September 30, 2011.*

On December 23, 2007, Sito presented to the emergency room "acutely intoxicated" with a laceration on her head.  (Tr. 384.)  A head CT scan was negative.  (Tr. 385.)  Her laceration was cleaned and sutured and she was discharged the same day.  (*Id.*)

On June 27, 2008, Sito visited the emergency room, reporting a vehicle had run over her left foot.  (Tr. 399.)  On examination, she could move her toes and ankle freely.  (*Id.*)  Her x-rays were negative for new fractures or dislocation.  (Tr. 401.)  The emergency room physicians cleaned her wound and provided her with a splint and crutches.  (Tr. 399, 401.)  Her diagnosis upon discharge was "contusion/abrasion, left foot."  (Tr. 401.)

Sito followed up with her primary care doctor, Robert Kanney, M.D., on June 30, 2008. (Tr. 508.)  Dr. Kanney observed "no real problem" with Sito's left ankle.  (*Id.*)  On examination, Sito did have an abrasion on her left foot.  (*Id.*)  Dr. Kanney diagnosed her with a soft tissue injury with cellulitis and prescribed Keflex, Motrin, and Vicodin.  (*Id.*)

---

conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

Sito returned to Dr. Kanney for treatment of her left foot injury several more times.  On July 7, 2008, Sito's cellulitis had improved.  (Tr. 507.)  On August 14, 2008, Sito reported she was using antibiotic cream on her left foot.  (Tr. 506.)  On examination, her left foot was red, so Dr. Kanney advised her to discontinue the antibiotic cream.  (*Id*.)  He prescribed Cipro and Diflucan.  (*Id*.)  On September 22, 2008, Sito's foot was still red.  (Tr. 505.)  Dr. Kanney determined this was likely a reaction to the antibiotic cream and noted Sito was "doing well overall."  (*Id*.)  He again recommended she stop using the antibiotic cream on her wound.  (*Id*.)  He prescribed Cipro and Hydrocodone.  (*Id.*)

On January 16, 2009, Sito presented to Maumee Valley Guidance Center for outpatient therapy with counselor David Brown, PCC.  (Tr. 368.)  Mr. Brown noted Sito was in counseling for anger management after hitting her husband's ex-wife.  (*Id*.)  Sito acknowledged this was a mistake and indicated her anger management group therapy was helpful.  (*Id*.)  By July 16, 2009, Sito completed her anger management program, including passing an exam and participating in group therapy.  (Tr. 369.)  On July 29, 2009, Mr. Brown drafted an "Agency Closing Summary" for Sito.  (Tr. 370.)  He noted Sito was in court-ordered therapy for a domestic violence charge and her last visit was on July 23, 2009.  (*Id*.)  Mr. Brown indicated Sito had "made excellent progress during the course of her treatment."  (*Id*.)  Her final diagnosis was adjustment disorder, not otherwise specified.  (*Id*.)

Sito sought chiropractic care for lower back pain on January 6, 2010.  (Tr. 452.)  On January 17, 2010, Sito visited the emergency room for a left hand laceration.  (Tr. 541.)  She reported her current medications as Lexapro, a cholesterol medication, Zyrtec, and Prilosec.  (Tr. 543.)

6

On March 10, 2010, Sito visited Dr. Kanney with several physical complaints.  (Tr. 504.) She reported she had fallen on her left elbow and sustained a left hand laceration, but her symptoms had resolved.  (*Id.*)  She described pre-menopausal symptoms.  (*Id.*)  Finally, she reported pain and stiffness in her right elbow and lower back pain.  (*Id.*)  On examination, Sito's elbow was tender.  (*Id.*)  Dr. Kanney ordered a left elbow x-ray, which was negative, beyond some minimal calcific densities in the lateral epicondyle.  (Tr. 410.)

Sito followed up with Dr. Kanney on November 9, 2010, reporting pelvic, chest, and abdominal pain.  (Tr. 502.)  On examination, she had abdominal tenderness.  (Tr. 503.)  Dr. Kanney ordered an abdominal CT scan.  (Tr. 414.)  The CT scan revealed thickening of the distal terminal ileum wall and multiple variable sized masses in the spleen.  (Tr. 418.)

On November 19, 2010, Sito visited surgical specialist Jeffrey Justice, M.D., for her abdominal pain and diarrhea.  (Tr. 567.)  Dr. Justice reviewed her abdominal CT scan and concluded she had diverticulitis.  (*Id.*)  He ordered stool samples and a colonoscopy.  (*Id.*)  Sito underwent a colonoscopy on November 22, 2010.  (Tr. 424, 426.)  This procedure revealed terminal ileal thickening, diverticulitis, and a normal colonic examination.  (Tr. 426.)  At the time of her colonoscopy, her diarrhea had improved.  (Tr. 424.)

Sito followed up with Dr. Justice on November 30, 2010.  (Tr. 558.)  Dr. Justice noted Sito's colonoscopy was essentially normal and her diarrhea was markedly improved.  (*Id.*)  He recommended a repeat colonoscopy in ten years.  (*Id.*)

Neither party directs this Court's attention to any medical records or evidence from 2011.

*c. evidence following the September 30, 2011 DLI*

On January 16, 2012, over three months after the date last insured, Sito visited Dr.

7

Kanney for "disability/paperwork."  (Tr. 448.)  She indicated she was filing for disability due to her remote left foot injury, back pain, and depression.  (*Id*.)  She reported her left foot and back pain limited her ability to walk, stand, and sit.  (*Id*.)  She relayed she was unable to lift more than 10-15 pounds.  (*Id*.)  As for her depression, Sito reported even with her antidepressant medication, her depression impacted her ability to function.  (*Id*.)  Dr. Kanney listed her medications as Lexapro, Prilosec, and Zyrtec.  (*Id.*)

On examination, Sito had tenderness and spasm from the middle of her thoracic spine to her sacrum.  (Tr. 449.)  Her straight leg raises were positive bilaterally, her reflexes were hyporeflexive, and she had left foot tenderness.  (*Id*.)  She exhibited no edema, good pulses in her left foot, and no calf tenderness.  (*Id*.)  Dr. Kanney continued Sito's current medications and referred her to Dr. Shamberg for a mental status evaluation.  (*Id*.)

On January 17, 2012, Dr. Kanney filled out a "Physical Impairment Questionnaire" prepared by Sito's attorney.  (Tr. 436-437.)  He noted he had treated Sito for less than 10 years and listed her diagnoses as degenerative disc disease, "neck/lower back, myofascial thoracic pain," fibromyalgia, and depression.  (Tr. 436.)  Dr. Kanney provided the following limitations for Sito:

- Her symptoms would frequently interfere with the attention and concentration required to perform simple work-related tasks;

- She would need to recline or lie down during an 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon;

- She cannot walk a city block without rest or significant pain;

- She can sit for 60 minutes at a time and stand/walk for 10 minutes at a time;

8

- She can sit for 4 hours total in an 8-hour workday and stand/walk for 2 hours total in an 8-hour workday;

- She requires a job which permits shifting positions at will from sitting, standing, or walking;

- She needs to take unscheduled breaks every two hours for 10-15 minutes during an 8-hour workday;

- She can occasionally lift up to 10 pounds and never lift 20-50 pounds;

- She would likely be absent from work more than four times a month due to her impairments; and

- She is not capable of working an 8-hour day for 5 days a week on a sustained basis.

(Tr. 436-437.)

In February 2012, Sito regularly visited chiropractor Patrick Mossburg, D.C., for treatment.  On February 13, 2012, she reported lower back pain and had a restricted lumbar range of motion.  (Tr. 468.)  Dr. Mossburg administered chiropractic manipulation.  (*Id*.)  On February 15, 2012, she continued to report lower back pain and stiffness.  (Tr. 467.)  Sito again underwent chiropractic manipulation.  (*Id*.)  On February 20, 2012, Sito indicated her condition had improved slightly.  (Tr. 466.)  She had a restricted lumbar range of motion and Dr. Mossburg administered chiropractic manipulation.  (*Id*.)

Sito followed up with Dr. Kanney on February 27, 2012.  (Tr. 445.)  She described chronic pain and urinary incontinence when she coughed and sneezed.  (*Id*.)  Sito reported the chiropractic treatment improved her hip pain, but not her back pain.  (*Id*.)  On examination, her lower back was tender to palpation.  (Tr. 446.)  She had muscle spasms and an abnormal range of motion.  (*Id*.)  There was tenderness in her sacroiliac joint, but no lower extremity weakness.

(*Id.*)  Her gait and stance were abnormal, but her deep tendon reflexes were normal.  (*Id.*)  Dr. Kanney ordered a lumbar MRI.  (*Id.*)

Sito received additional chiropractic treatment on February 28 and 29, 2012.  (Tr. 465, 464.)  On February 29, 2012, she had a restricted lumbar range of motion and tenderness in her cervical spine.  (Tr. 464.)  Dr. Mossburg prescribed orthotics for both feet.  (*Id.*)

On March 1, 2012, Sito underwent a lumbar MRI.  (Tr. 484.)  This testing revealed (1) disc degeneration at L4-5 and L5-S1; (2) spinal stenosis at L5-S1, which "partly this could be due to congenitally short pedicles;" (3) "a broad-based disc protrusion and hypertrophic facet arthritis and hypertrophy of the ligamentum flavum resulting in mild spinal stenosis;" (4) no neural foraminal stenosis; (5) a small posterior-central and right paracentral disc protrusion at L4-5, causing "mild indentation on the thecal sac without spinal stenosis or neural foraminal stenosis."  (*Id.*)

Sito returned to Dr. Mossburg for chiropractic treatment on March 5, 2012.  (Tr. 463.)  Dr. Mossburg noted improvement in Sito's condition, but a restricted lumbar range of motion.  (*Id.*)  On March 8, 2012, Sito reported lower back pain and neck pain.  (Tr. 462.)  Dr. Mossburg recommended continued "conservative chiropractic management" and noted tenderness and a restricted range of motion.  (*Id.*)

On March 8, 2012, Sito reviewed her lumbar MRI with Dr. Kanney.  (Tr. 443.)  On examination, Sito had muscle spasm and abnormal motion in her lumbosacral spine.  (Tr. 444.)  She also had tenderness in her sacroiliac joint and lower extremity weakness.  (*Id.*)  Dr. Kanney prescribed an anti-inflammatory and muscle relaxants.  (*Id.*)  He referred her to a specialist.  (*Id.*)

On April 9, 2012, Sito visited Neil S. Shamberg, Ph.D., for a psychological evaluation.

10

(Tr. 470.)  Dr. Shamburg noted Sito presented with an average range of intelligence.  (Tr. 471.)

Sito reported her participation in court-ordered anger management classes but denied any current

psychotherapy or counseling.  (Tr. 471-472.)  Sito reported her primary care physician prescribed

her Lexapro for depression.  (Tr. 472.)

During the evaluation, Sito alternated between sitting and standing due to her back pain.

(*Id*.)  Her mood was depressed, but she made good eye contact.  (*Id*.)  Her thought processes

were logical, coherent, and goal directed.  (Tr. 473.)  She reported suicidal ideation back in 1987,

but denied any current thoughts of suicide.  (*Id*.)  She did not manifest any signs of anxiety, but

did report an avoidance of big crowds.  (*Id*.)  Her insight and judgment was average.  (*Id*.)

Based upon this evaluation, Dr. Shamberg diagnosed Sito with dysthymic disorder,

anxiety disorder, a history of adult antisocial behavior, and a history of alcohol abuse in

remission.  (Tr. 474.)  He assessed a Global Assessment of Functioning ("GAF") score of 50.

(*Id*.)  Dr. Shamberg offered the following opinion on Sito:

> **Describe the claimant's abilities and limitations in understanding,**
> **remembering, and carrying out instructions:**
> Denise McKelvey[4] is of average intelligence, and would not have many
> problems or limitations with regard to understanding; she does have some
> slight to moderate memory loss, and that would be problematic on some jobs
> now.
>
> **Describe the claimant's abilities and limitations in maintaining attention**
> **and concentration, and in maintaining persistence and pace, to perform**
> **simple tasks and to perform multi-step tasks:**
> Leaving aside her neck and low back pain and spasms, Denise McKelvey
> would not have too many limitations apparently, with regard to maintaining
> attention and concentration; however she is slowed down considerably by her
> depression, and this would give her rather severe limitations now with regard
> to keeping up the pace at most jobs, and with regard to persistence with job

---

[4]     Sito's last name has also been McKelvey.  (Tr. 251.)

11

tasks.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting:**
This could be problematic for Denise McKelvey, who reports that her last job ended in 2007 at a gas station in Montpelier because "I had issues with my boss there."  There is also a history of court ordered Anger Management classes in her past, at the Maumee Valley Guidance Center, (See above).

**Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting:**
Because of some temper management problems now, and chronic currently deep severe depression Denise McKelvey would have fairly severe limitations it is felt, with regard to her ability to respond appropriately to most work pressures, in all work settings now.

(Tr. 475.)

On April 12, 2012, Dr. Shamberg filled out a "Mental Capacity Assessment" Form,

detailing the following limitations for Sito:

- Slight limitations in remembering locations and work-like procedures;

- Moderate limitations in the following areas:

  - understanding, remembering, and carrying out very short and simple instructions;
  - working in coordination with or in proximity to others without being distracted by them;
  - making simple work-related decisions;
  - asking simple questions or requesting assistance;
  - getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and
  - maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness;

- Marked limitations in the following areas:

  - understanding, remembering, and carrying out detailed instructions;
  - performing activities within a schedule, maintaining regular attendance, and being punctual without customary tolerances;

12

- sustaining an ordinary routine without special supervision;
- completing a normal workday without interruptions from psychologically based symptoms;
- interacting appropriately with the general public;
- accepting instructions and responding appropriately to criticism from supervisors;
- being aware of normal hazards and take appropriate precautions;
- traveling in unfamiliar places or using public transportation; and
- setting realistic goals or making plans independent of others;

- Extreme limitations in the following areas:

  - maintaining attention and concentration for extended periods;
  - completing a normal workweek without interruptions from psychologically based symptoms;
  - performing at a consistent pace with a standard number and length of rest periods; and
  - responding appropriately to changes in the work setting.

(Tr. 477-479.)  Dr. Shamberg also opined Sito would likely miss four days of work each month. (Tr. 478.)

Sito underwent bilateral hip x-rays on April 19, 2012.  (Tr. 512, 513.)  Both x-rays were negative, indicating no acute fracture, dislocation, articular narrowing, or avascular necrosis. (*Id.*)

Sito returned to Dr. Kanney on June 7, 2012, reporting bilateral foot pain.  (Tr. 494.)  She had localized soft tissue swelling her feet.  (*Id.*)  Dr. Kanney ordered foot x-rays and labwork. (Tr. 495.)  He diagnosed a foot sprain and recommended rest and ice.  (*Id.*)  Her foot x-rays were negative, beyond a calcaneal spur in the right foot.  (Tr. 489, 490.)

On July 18, 2012, Sito visited podiatrist Samuel Neuschwanger, DPM.  (Tr. 616.)  Dr. Nueschwanger noted a recent EMG revealed bilateral tarsal tunnel syndrome and lumbar radiculopathy.  (*Id.*)  He recommended decompression procedures on both feet for her tarsal

13

tunnel syndrome.  (*Id*.)

Sito underwent a tarsal tunnel release on her left foot.  (Tr. 610.)  On September 11, 2012, Dr. Kanney noted this procedure was successful, as Sito had "increased sensation and motion in foot."  (*Id*.)  Sito reported her back pain was unchanged and she was unable to function without pain medications.  (*Id*.)  Dr. Kanney noted some redness around the surgical incision on her foot, so he prescribed an antibiotic.  (Tr. 611.)  He also prescribed Vicodin.  (*Id*.)

On November 16, 2012, Sito reported neck pain which "started five weeks ago with chest pain into left breast and left ear."  (Tr. 606.)  She also indicated lower back pain with radiation into her legs and constant fatigue.  (*Id*.)  On examination, Dr. Kanney noted tenderness and abnormal motion in Sito's thoracolumbar spine.  (Tr. 607.)  He ordered bloodwork and a cervical spine MRI.  (*Id*.)

A November 29, 2012 cervical spine MRI revealed (1) a broad based leftward disc protrusion at C5-6, which produced foraminal narrowing; (2) mild degenerative spondylosis; and (3) a minimal disc osteophyte complex at C6-7.  (Tr. 597.)

Sito reviewed these MRI results with Dr. Kanney on December 7, 2012.  (Tr. 592.)  She reported neck pain radiating into her shoulder.  (*Id*.)  Dr. Kanney noted her labwork was essentially normal, beyond her HDL (i.e. cholesterol) levels.  (*Id*.)  He referred her to an orthopedic surgeon.  (Tr. 593.)

On December 14, 2012, Sito consulted with neurosurgeon James Dozier, M.D.  (Tr. 591.)  She reported neck and left arm pain "since summer."  (*Id*.)  On examination, her upper and lower extremity strength was normal and her sensory examination was grossly intact.  (*Id*.)  Dr. Dozier recommended she "exhaust nonsurgical measures first," including at-home cervical traction.

14

(*Id.*)

Sito returned to Dr Kanney on April 15, 2013, reporting foot pain.  (Tr. 587.)  Dr. Kanney noted she needed to undergo a tarsal tunnel procedure on her right foot, but her left foot was still burning and painful.  (*Id.*)  On examination, she had bilateral foot tenderness, but no swelling in her toes.  (Tr. 588.)  Dr. Kanney prescribed Vicodin and referred her to a podiatrist.  (*Id.*)

Sito visited Dr. Kanney on September 25, 2013 for bilateral foot pain.  (Tr. 579.)  She reported Cymbalta had improved her fibromyalgia, but she was still depressed and experiencing a burning sensation in her legs.  (*Id.*)  Dr. Kanney noted Sito would "probably need surgery in the near future."  (*Id.*)  On examination, she had tenderness in her feet.  (Tr. 580.)  Dr. Kanney increased her Cymbalta dosage and prescribed Vicodin.  (*Id.*)

On December 12, 2013, Sito visited Dr. Kanney to "go over paperwork for SSDI."  (Tr. 643.)  She reported neck pain, shoulder joint pain, muscle spasm in her lower back, tingling/numbness in her legs, and leg and foot weakness.  (*Id.*)  Dr. Kanney and Sito "discussed her chronic neck/back problems and her limitations from that as well as the foot pain which aggravates everything else."  (*Id.*)  On examination, Sito exhibited lower back tenderness, abnormal motion in her thorcolumbar spine, and muscle spasm in her lumbosacral spine.  (Tr. 644.)  Dr. Kanney assessed a backache and recommended she reduce her physical activity.  (*Id.*)

That same date, Dr. Kanney filled out a "Residual Functional Capacity Questionnaire" prepared by Sito's attorney.  (Tr. 623-624.)  He noted he had treated Sito for less than 10 years and listed her diagnoses as herniated disc, chronic back pain, neck pain, and foot pain.  (Tr. 623.)  Dr. Kanney provided the following limitations for Sito:

- Her symptoms would frequently interfere with the attention and concentration required to perform simple work-related tasks;

- She would need to recline or lie down during an 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon;

- She cannot walk any city blocks without rest or significant pain;

- She can sit for 20 minutes at a time and stand/walk for 20 minutes at a time;

- She can sit for 3 hours total in an 8-hour workday and stand/walk for 3 hours total in an 8-hour workday;

- She requires a job which permits shifting positions at will from sitting, standing, or walking;

- She needs to take unscheduled breaks every hour for 15 minutes during an 8-hour workday;

- She can occasionally lift less than 10 pounds and never lift 10-50 pounds;

- She can use her hands/fingers/arms for 75% of the day to perform grasping, turning, twisting, and fine manipulation and 50% of the day for reaching;

- She would likely be absent from work more than four times a month due to her impairments; and

- She is not capable of working an 8-hour day for 5 days a week on a sustained basis.

(Tr. 623-624.)  Dr. Kanney also filled out a "Mental Capacity Assessment" form prepared by Sito's attorney.  (Tr. 820-822.)  Within the form, Dr. Kanney found no limitations in most areas, with the exception of (1) extreme limitations in performing at a consistent pace with a standard number and length of rest periods; (2) having more than four absences in an average month; and (3) moderate limitations in traveling in unfamiliar places or using public transportation.  (Tr. 821, 822.)

16

On June 2, 2014, Dr. Kanney filled out another "Residual Functional Capacity Questionnaire" prepared by Sito's attorney.  (Tr. 648-649.)  This time, he reported he treated Sito for about 20 years.  (Tr. 648.)  He listed her diagnoses as neck, back, foot pain, and depression. (*Id.*)  Dr. Kanney provided the following limitations for Sito:

- Her symptoms would constantly interfere with the attention and concentration required to perform simple work-related tasks;

- She would need to recline or lie down during an 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon;

- She can walk between 0 and .5 city blocks without rest or significant pain;

- She can sit for 30 minutes at a time and stand/walk for 10 minutes at a time;

- She can sit for 4 hours total and stand/walk for 2 hours total in an 8-hour workday;

- She requires a job which permits shifting positions at will from sitting, standing, or walking;

- She needs to take unscheduled breaks every half hour for 10-15 minutes during an 8-hour workday;

- She can occasionally lift up to 10 pounds and never lift 20-50 pounds;

- She can use her hands/fingers/arms for 20% of the day to perform grasping, turning, twisting, fine manipulation, and reaching;

- She would likely be absent from work more than four times a month due to her impairments; and

- She is not capable of working an 8-hour day for 5 days a week on a sustained basis.

(Tr. 648-649.)  Following this questionnaire, Dr. Kanney attached an "Onset Date

17

Questionnaire," reporting he had treated her since 1987 and she had the above listed restrictions since early 2001.  (Tr. 650.)

That same date, Dr. Kanney filled out another "Mental Capacity Assessment" prepared by Sito's attorney.  (Tr. 824-826.)  He again found no limitations in most areas, with the exception of (1) moderate limitations in maintaining attention and concentration for extended periods; (2) moderate limitations in performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; (3) slight limitations in working in coordination with or in proximity to others without being distracted by them; (4) slight limitations in performing at a consistent pace with a standard number and length of rest periods; (5) having one absence in an average month; and (6) marked limitations in traveling in unfamiliar places or using public transportation.  (Tr. 824-826.)

## C.    State Agency Reports

### 1.    Mental Impairments

On April 9, 2012, state agency physician Carl Tishler, Ph.D., reviewed Sito's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 86.)  He concluded "there is insufficient evidence to evaluate her disability on or before 9/30/11, the date she was last insured for benefits."  (*Id.*)

On September 6, 2014, state agency physician Caroline Lewin, Ph.D., reviewed Sito's medical records and concluded there was insufficient evidence as "there is no evidence in time period to evaluate severity of limitations."  (Tr. 98-99.)

### 2.    Physical Impairments

On January 11, 2014, Sito underwent a physical consultative examiner with Christina

18

Feser, D.O.  (Tr. 626-641.)  Sito reported a "history of fibromyalgia since 2011," herniated discs, neck and back pain, and podiatry issues.  (Tr. 626.)  On examination, Sito had a symmetric, steady gait, with no assistive device.  (Tr. 629.)  She had decreased sensation to light touch in her left foot, and her straight leg raise was positive on the left side.  (*Id*.)  She had no joint swelling, but tenderness in her cervical, thoracic, lumbar spine and left foot.  (Tr. 630.)  She was able to lift and carry light objects.  (*Id*.)  She was able to squat and rise with moderate difficulty.  (*Id*.)  Sito could rise from a seated position without difficulty and had no issues getting on and off the examination table.  (*Id*.)  She could walk on her heels and toes, but could not hop on either foot bilaterally.  (*Id*.)  She had full strength on examination and no deficits in grasp manipulation, pinch, or fine coordination.  (*Id*.)

Based upon this examination, Dr. Feser provided the following discussion regarding Sito's limitations:

> The claimant can be expected to sit normally in an 8-hour workday with normal breaks.  The claimant has mild limitations with standing and walking due to back and left foot pain.  The claimant does not need an assistive device with regards to short and long distances and uneven terrain.  The claimant has mild limitations with lifting and carrying weight due to back and left foot pain.  There are limitations on bending, stooping, crouching, squatting and so on and the claimant will be able to perform these occasionally due to back and left foot pain.  There are no manipulative limitations on reaching, handling, feeling, grasping, fingering and the claimant will be able to perform these frequently.  There are no relevant visual, communicative or work place environmental limitations.

(Tr. 631.)  Dr. Feser also provided a detailed opinion on Sito, finding the following limitations:

- She can continuously lift/carry up to 10 pounds, frequently lift/carry 10 pounds, occasionally lift 21-50 pounds, never carry 21-50 pounds, and never lift/carry 51-100 pounds;

- She sit for 8 hours at a time and 8 hours total in an 8-hour workday;

19

- She can stand/walk for 2 hours at a time and 4 hours total in an 8-hour workday;

- She does not require a cane to ambulate;

- She can continuously reach, handle, finger, feel, push, and pull with both hands;

- She can continuously use foot controls with both feet;

- She can frequently climb ramps and stairs and never climb ladders or scaffolds;

- She can continuously balance and occasionally stoop, kneel, crouch, and crawl;

- She can never work at unprotected heights or near moving mechanical parts;

- She can occasionally work near humidity and wetness, pulmonary irritants, extreme cold, extreme heat, and vibrations;

- She can continuously operate a motor vehicle; and

- She can work in environments with quiet or moderate noise levels.

(Tr. 632-636.)

On April 9, 2012, state agency physician Maureen Gallagher, D.O., reviewed Sito's medical records and concluded there was insufficient evidence to evaluate Sito's disability prior to September 30, 2011, her date last insured.  (Tr. 85.)

On September 13, 2012, state agency physician Maria Congbalay, M.D. reviewed Sito's medical records and concluded there was insufficient evidence "to make a determination on the extent of the limitations."  (Tr. 98.)

**D.      Hearing Testimony**

During the January 29, 2014 hearing, Sito testified to the following:

20

- She last worked at a gas station in 2007.  (Tr. 64.)  She had to stop working due to the pain from lifting beer and pop.  (*Id.*)  She also wanted to be home full-time to care for her husband's children in the event they obtained custody of them.  (Tr. 66-67.)

- She wants to go back to work but she is in too much pain.  (Tr. 68.)  She takes care of her step children and takes them to the school bus in the morning.  (*Id.*)

- She does not have a cane, but she "could use one every once in a while."  (Tr. 70.)  She falls down when walking on uneven terrain.  (Tr. 72.)  She can walk 200 yards and lift and carry five to ten pounds.  (Tr. 73-74.)

- She was not able to afford any medical treatment between 2008 – 2012 due to financial constraints.  (Tr. 74.)  She is now able to afford medical care, but prior to 2012, she was experiencing the same health problems.  (Tr. 75.)

- Her most significant health problems are left foot, neck, and back pain.  (*Id.*)  Her back pain radiates into her legs.  (Tr. 77.)

During this hearing, the VE testified Sito had past work as a gas station cashier.  (Tr. 79.)  The ALJ determined this work was "a part-time employment position[] it did not constitute substantial gainful activity within the, within the Social Security Act definition and is therefore not prior relevant work."  (Tr. 80.)  The ALJ then posed the following hypothetical question:

> I would like you to assume a hypothetical individual of the claimant's age and education with no prior work, no prior relevant work and please assume that the individual is limited to the following.  Less than full range of light[5]

---

[5]    "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 CFR § 404.1567(b).

21

work, with the additional limitations of sitting no more than one hour, standing no more than one hour, walking no more than one hour, never using foot controls with the left foot, occasionally climbing ramps and stairs, never climbing ladders, ropes, or scaffolds, never balancing, stooping, kneeling, crouching or crawling.  Never required to use unprotected heights, move mechanical parts, operate a motor vehicle, never exposed to extreme cold, limited to perform simple, routine and repetitive tasks, absent from work one day a month.

(*Id.*)  The VE testified there would be no work available for this hypothetical individual.  (*Id.*)

During the June 4, 2014 hearing, Sito testified to the following:

- She has a high school education.  (Tr. 33.)  She has had health insurance since 2006.  (Tr. 34.)  She has worked as a gas station cashier, a waitress, a bartender, a machine operator, and a maintenance worker.  (Tr. 34-37.)

- She has shoulder, neck, and back pain.  (Tr. 40-41.)  She received a diagnosis of fibromyalgia and has undergone physical therapy for her pain.  (Tr. 41.)  She has had lower back pain for "a long time," and has been receiving treatment for such since she was 18.  (Tr. 44.)

- A car ran over her left foot.  (Tr. 42.)  In 2011, she could walk about a quarter of a mile and stand for 20 minutes.  (Tr. 42, 44.)  In 2012, she underwent left foot surgery.  (Tr. 41.)  She has not undergone the procedure on her right foot because she does not think her left foot is "strong enough to carry my weight for the healing time." (Tr. 41-42.)

- In 2011, she would not be able to sit in a chair for very long.  (Tr. 45.)  She could lift about 20-25 pounds, but it would "put [her] out," so she would only lift about 10 pounds at that time.  (*Id.*)  She could not kneel and her husband would help her with her personal hygiene.  (*Id.*)

- She is on an antidepressant, which keeps her "pretty level."  (Tr.

Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

50.)  She feels her depression "comes from the fact that I cannot do
like I used to do."  (Tr. 51.)

The VE testified Sito had past work as a janitor, bartender, small parts assembler, and

machine operator.  (Tr. 53-54.)  The ALJ then posed the following hypothetical question:

Let's assume we have a hypothetical individual vocationally situated as is
our claimant.  Let's assume that individual can perform the functions of any
exertional category of work except no climbing ladders and the like.  No
exposure to obvious hazards.  The individual can also understand, carry out
and remember simple instructions, but the pace of productivity is not dictated
by an external source over which the individual has no control, such as an
assembly line or conveyor belt.  Make judgments on simple work, and
respond appropriately to usual work situations and changes in a routine work
setting that is repetitive from day to day with few and expected changes.

(Tr. 54.)

The VE testified the hypothetical individual would be able to perform Sito's past work as

small parts assembler and janitor.  (Tr. 54.)  The ALJ added the additional limitation of "the

individual could sit, stand, or walk for 30 minutes at a time, but only, but for a total of four of

eight hours each in a workday."  (Tr. 55.)  The VE explained this would eliminate Sito's past

work as a janitor, but not the small parts assembler.  (*Id.*)  The VE further explained the

hypothetical individual would also be able to perform other representative jobs in the economy,

such as a production inspector (D.O.T. #739.687-102); a packer (D.O.T. #559.687-074), and a

shipping weigher (D.O.T. #222.387-074).  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

23

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

24

Here, Sito was insured on her alleged disability onset date, March 1, 2007, and remained insured through September 30, 2011, her date last insured ("DLI.")  (Tr. 657.)  Therefore, in order to be entitled to POD and DIB, Sito must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

In the July 19, 2017 decision, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

2.  The claimant engaged in substantial gainful activity during the period from her alleged onset date of March 1, 2007 through her date last insured of September 30, 2011 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the claimant has the following severe impairment: depression/dysthymic disorder (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,  404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: no climbing ladders and the like and no exposure to obvious hazards.  The claimant could also: understand, carry out and remember simple instructions where the pace of productivity is not dictated by an external source over which the claimant has no control such as an assembly line or conveyor belt; make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes; and respond appropriately to supervision, the general public and coworkers.

25

6.      Through the date last insured, the claimant was capable of performing past relevant work as a small parts assembler.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant was not  under a disability, as defined in the Social Security Act, at any time from March 1, 2007, the alleged onset date, through September 30, 2011, the date last insured (20 CFR 404.1520(f)).

(Tr. 657-666.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to

support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203

F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion,

the decision of the Administrative Law Judge must stand if the evidence could reasonably

support the conclusion reached.")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing

*Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

  In addition to considering whether the Commissioner's decision was supported by

substantial evidence, the Court must determine whether proper legal standards were applied.

Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.").

  Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result."  *Fleischer v.

Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.

27

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.

Ohio July 9, 2010).

## VI.  ANALYSIS

**A.        Compliance with Remand Order**

Sito first[6] argues the ALJ violated Magistrate Judge Baughman's January 2017 Opinion

& Order (hereinafter "remand order").  (Doc. No. 15 at 16.)  Specifically, Sito maintains this

"Court previously remanded this case due to the ALJ's failure to accord proper deference to the

treating source opinions from Dr. Kanney, and the decision on remand failed to correct this error,

resulting in a failure to properly evaluate Plaintiff's physical impairments."  (*Id.*)  Sito asserts the

"ALJ once again failed to follow [the good reasons] standard and properly evaluate Dr. Kanney's

opinion . . . asserting only generalizations and speculation as reasons for discounting the

opinion."  (*Id*. at 16-17.)  In particular, Sito argues the ALJ's reasoning regarding her gaps in

treatment "is the type of unsupported assertion criticized by this Court's previous decision."  (*Id*.

at 17.)

The Commissioner does not directly address Sito's argument regarding the ALJ's

failure to comply with the remand order.  (*See* Doc. No. 16.)  Rather, the Commissioner

maintains Dr. Kanney's opinion was properly weighed and considered.  (*Id*. at 8, 9.)

---

[6]        The Court recognizes Sito frames her first assignment of error as an RFC
argument, asserting "The RFC determination is unsupported by substantial
evidence."  (Doc. No. 15 at 15.)  Upon close review of her brief, however, the
Court recognizes Sito is actually raising three separate arguments under her first
assignment of error: (1) failure to comply with the remand order; (2) failure to
properly weigh the opinion of a treating physician; and (3) "failure to properly
evaluate [Sito's] physical impairments at Step Two, with a corresponding failure
to include any physical limitations in the RFC."  (*Id*. at 16-20.)  Thus, the Court
will address each of these arguments separately.

The Sixth Circuit has held that, where a federal district court has reversed the Commissioner's final decision and remanded the case for further proceedings, "it is the duty of ... the agency from which appeal is taken ... to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions." *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967). As that Court later explained:

> In some Social Security cases, district courts will include detailed instructions concerning the scope of the remand and the issues to be addressed. In such cases, "[d]eviation from the court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989). *See also Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967) ... These cases stand for the proposition that the administrative law judge may not do anything expressly or impliedly in contradiction to the district court's remand order.

*Hollins v. Massanari*, 2002 WL 31398968 at * 2 (6th Cir. Oct. 17, 2002).

That being said, the Sixth Circuit noted in *Hollins* that "[t]hese cases do not preclude the ALJ from acting in ways that go beyond, but are not inconsistent with, the district court's opinion." *Id*. Indeed, courts have found that "as long as an issue was not finally decided in the District Courts, the ALJ can exceed the scope of a remand order and reconsider any evidence deemed appropriate in reaching a decision regarding a claim." *Beatty v. Comm'r of Soc. Sec*., 2015 WL 5693663 at * 3 (E.D. Mich. Sept. 29, 2015). *See also Drossman v. Comm'r of Soc. Sec*., 2008 WL 1848202 at * 6 (N.D. Ohio April 17, 2008) (finding that "*Hollins* explicitly allowed ALJs receiving a case on remand to move beyond the issues examined in the district court opinion" and "ALJs should not feel constrained to only consider the limited issues previously presented and specifically remanded for further consideration."); *Killings v. Colvin*, 2016 WL 2868699 at * 12–13 (N.D. Ohio May 17, 2016) (same).

29

Relevant to here, the previous ALJ determined Sito had no severe physical impairments.

(Tr. 15.)  The ALJ provided the following discussion when reaching this conclusion:

> The claimant also reported a history of fibromyalgia since 2011.  (Exhibit 19F).  SSR 12-2p provides that the undersigned cannot relay upon the physician's diagnosis alone.  The evidence must document that the physician reviewed the person's medical history and conducted a physical examination.  The examination must show that the claimant has at least 11 positive tender points on physical examination.  As the claimant was only diagnosed with a "history of fibromyalgia," it is not a medically determinable impairment.

(Tr. 16.)  The previous ALJ also weighed the opinions of Dr. Kanney, Sito's treating physician,

as follows:

> The undersigned gives Dr. Kanney's opinion no weight as it was rendered after the claimant's date last insured, and as such, is of little probative value and gives no indication that such limitations would have been needed prior to September 2011.

(Tr. 20.)  On appeal to this Court, Magistrate Judge Baughman held as follows:

> Here, although the ALJ did directly cite to SSR 12–2P in discussing Sito's fibromyalgia, she mis-characterized that regulation as requiring a clinical finding of eleven positive trigger points to support a diagnosis of fibromyalgia, thus overlooking entirely the alternative test set forth in SSR 12–2P which does not contain trigger point testing.  That alone is grounds for a remand.
>
> Further, and as noted above, the ALJ gave little weight to the functional opinion of Dr. Kanney, a treating source who included fibromyalgia as one of his diagnosis in his 2012 physical impairment questionnaire.  The reason given for according such little weight—that the opinion itself was issued after the date last insured and does not indicate that the limitations apply to the relevant period—are simply not a good reasons.  As the Sixth Circuit observed in *Wilson*, functional limitations expressed by a treating source as the result of treating the claimant during the insured period would necessarily be supported by what was observed during that same period, and so even if the opinion itself were drafted at a date beyond the date last insured, the functional opinion itself, without more, cannot be reasonably construed as offering an opinion only as to the period after the date last insured.

30

> As has also been noted, the opinions of Dr. Kanney themselves are not
> themselves entirely consistent or clear as to the length of the treatment
> relationship, the diagnoses given or the symptoms recorded, and there are
> gaps in the record as to supporting treatment notes.  But, these opinions do
> represent the views of a physician who treated Sito for a considerable
> period of time, and who has recorded functional limitations that are more
> restrictive than those in the RFC.  As such, it is critical that Dr. Kanney's
> opinions be properly weighed and fully analyzed in accordance with the
> treating physician rubric—something which was not done here.  To the
> degree that the opinions are found to be supported by clinical and
> diagnostic tests and to be consistent with the other evidence in the record,
> Dr. Kanney's opinions may provide the kind of "longitudinal records" that
> are especially helpful in establishing the existence and severity of an
> impairment like fibromyalgia, particularly when it has not been established
> by means of trigger point tests.

*Sito,* 229 F.Supp.3d at 646-647.  After the Appeals Council vacated the June 2014 decision, the

ALJ at issue considered the evidence and determined Sito was not disabled prior to her date last

insured.  (Tr. 654-666.)  At the beginning of the decision, the ALJ recounted the above

procedural history and expressly stated as follows:

> The District Court determined that Dr. Kanney's opinions were not
> properly weighed and fully analyzed in accordance with the treating
> physician rubric.  The District Court found that the reason for given the
> according little weight to the opinion, that it was issued after the date last
> insured, does not indicate that the limitation did not apply to the relevant
> period.  Lastly, the District Court found SSR 12-2p was mis-characterized
> as requiring a clinical finding of eleven positive trigger points to support a
> diagnosis of fibromyalgia.  (Exhibit 7A).

(Tr. 654-655.)

At step two, the ALJ determined Sito did not have any severe physical impairments.

(Tr. 657.)  Of particular relevance, at this step, the ALJ provided the following discussion

regarding Sito's allegations of fibromyalgia:

> The claimant also reported a history of fibromyalgia. (Exhibit 19F).  With
> regard to the claimant's allegations of fibromyalgia, the undersigned has
> considered SSR 12-2p, which instructs adjudicators how to evaluate

31

fibromyalgia and its corresponding functional limitations.  There are two sections providing criteria for a finding of fibromyalgia as a medically determinable impairment.  In order to find a medically determinable impairment, each of the criteria in the first or second section must be met.  Further, the evidence must be consistent with the other objective evidence of record.  The first set of criteria requires a history of widespread pain, at least 11 positive bilateral tender points on examination, both above and below the waist, and evidence that other disorders that could cause the signs or symptoms were excluded.  The second set of criteria are preliminary diagnostic criteria, and require a history of widespread pain, repeated manifestations of six or more fibromyalgia symptoms, and evidence that other disorders which could cause the repeated manifestation of symptoms, signs, or co-occurring conditions were excluded.  According to the criteria outlined in SSR 12-2p, the undersigned does not find that the objective findings of record support a medically determinable impairment of fibromyalgia.

(Tr. 658.)

At step four, the ALJ discussed the "significant gaps in the claimant's history of treatment," noting "most of the medical records being dated prior to the claimant's alleged onset date, or after her date last insured."  (Tr. 662.)  As discussed at greater length *infra*, the ALJ then considered the opinion evidence provided by Dr. Kanney, assigning "little weight" to his physical assessments and "some weight" to his mental assessments.  (Tr. 662-663.)  In respect to Dr. Kanney's physical assessments, the ALJ reasoned (1) the opinion was "without substantial support from the other evidence of record;" (2) "a doctor may express an opinion in an effort to assist a patient with whom he sympathizes;" and (3) "the opinion in question departs substantially from the rest of the evidence of record."  (Tr. 663.)

The Court finds the ALJ did not violate the remand order.  As required by that order, the ALJ considered both ways in which fibromyalgia can be established as a medically determinable impairment under SSR 12-2p.  (Tr. 658.)  She also re-visited the opinion evidence from Dr.

32

Kanney, providing additional reasoning[7] as to why she rejected his opinions.  (Tr. 662-663.)

Sito argues the reasons provided by the ALJ for rejecting Dr. Kanney's opinions are "the type of unsupported assertion criticized by this Court's previous decision."  (Doc. No. 15 at 17.)  This argument is without merit.  The prior ALJ rejected Dr. Kanney's opinions because (1) they were rendered after the date last insured and (2) did not indicate if the limitations would apply to the relevant period.  (Tr. 20.)  The remand order found these did not constitute "good reasons."  *Sito*, 229 F.Supp.3d at 646-647.  Here, the ALJ relied on different reasons for rejecting Dr. Kanney's opinions.  Indeed, after discussing the medical evidence in the record, the ALJ asserts the "opinion departs substantially from the rest of the evidence of record."  (Tr. 663.)  This is not the same line of reasoning the remand order had criticized.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not violate Magistrate Judge Baughman's Opinion & Order.

## B.      Treating Physician Opinion Evidence

Sito next argues the ALJ improperly evaluated and weighed the opinion of her treating physician, Dr. Kanney.  (Doc. No. 15 at 16.)  She asserts the ALJ only provided "generalizations and speculation as reasons for discounting the opinion."  (*Id*. at 17.)  Sito maintains the ALJ's rejection of Dr. Kanney's opinion "is illogical," noting (1) her "physical impairments were by no means *new* in 2012" and (2) she had "reasonably explained the basis for infrequent treatment due to financial difficulties."  (*Id*. at 17-18.)(emphasis in original.)  Sito also asserts there is "absolutely nothing in the record to support" the ALJ's speculation regarding Dr. Kanney's

---

[7]      The Court will address Sito's arguments as to whether this new line of reasoning constitutes "good reasons" under the treating physician rule, *infra*.

motivation for providing his opinion.  (*Id*. at 19.)

The Commissioner maintains the ALJ properly weighed and considered Dr. Kanney's opinion.  (Doc. No. 16 at 8, 9.)  The Commissioner asserts Sito "minimized the importance of insured status," noting Dr. Kanney's opinion was "dated after her insured status expired."  (*Id*. at 9, 10.)  The Commissioner argues while Dr. Kanney was permitted to express an opinion on Sito's condition during her insured period, the "opinion must be supported by the evidence of record."  (*Id*. at 10.)  She contends while Sito "complains that the ALJ did not sufficiently analyze the statement" there is "virtually nothing to be analyzed because the doctor's treatment record was so minimal."  (*Id*. at 12.)  Finally, the Commissioner asserts the ALJ's speculation as to why Dr. Kanney provided his opinion is "dicta and not relevant."  (*Id*. at 17.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[8]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20

---

[8]    Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[9]  *See also Gayheart*, 710 F.3d at 376

("If the Commissioner does not give a treating-source opinion controlling weight, then the

opinion is weighed based on the length, frequency, nature, and extent of the treatment

relationship, *id.,* as well as the treating source's area of specialty and the degree to which the

opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. §

404.1527(c)(2)-(6).")

 If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See*

*also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently

clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where

a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered

when told by an administrative bureaucracy that she is not, unless some reason for the agency's

decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir.

2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and

---

[9] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to
a treating physician's opinion, the Commissioner should consider the length of
the relationship and frequency of examination, the nature and extent of the
treatment relationship, how well-supported the opinion is by medical signs and
laboratory findings, its consistency with the record as a whole, the treating
source's specialization, the source's familiarity with the Social Security program
and understanding of its evidentiary requirements, and the extent to which the
source is familiar with other information in the case record relevant to the
decision.

35

permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at

544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to

articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of

substantial evidence, even where the conclusion of the ALJ may be justified based upon the

record." *Rogers*, 486 F.3d at 243.[10]

Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled, but may reject such determinations when good reasons are identified for not

accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of

Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383,

391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner

makes the determination whether a claimant meets the statutory definition of disability.  This

necessarily includes a review of all the medical findings and other evidence that support a

medical source's statement that one is disabled.  "A statement by a medical source that you are

'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*.

It is the Commissioner who must make the final decision on the ultimate issue of disability.

---

[10] "On the other hand, opinions from nontreating and nonexamining sources are never
assessed for 'controlling weight.'  The Commissioner instead weighs these opinions
based on the examining relationship (or lack thereof), specialization, consistency, and
supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R.
§ 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be
considered in assessing any type of medical opinion.  *Id*. § 404.1527(c)(6)." *Gayheart*,
710 F.3d at 376.

*Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

At step two, the ALJ discussed the medical evidence regarding Sito's physical allegations, noting the "record is devoid of evidence to establish" a severe physical medically determinable impairment.  (Tr. 657.)  She noted Sito's December 2007 head laceration, June 2008 foot injury, November 2010 colonoscopy, and January 2011 chiropractic treatment.  (Tr. 657-658.)  She acknowledged Sito's March 2012 MRI, noting it was from "six months after the date last insured."  (Tr. 658.)

At step four, the ALJ weighed Dr. Kanney's opinions[11] as follows:

> Turning to the opinion evidence, in physical impairment questionnaires, completed in January 2012 and December 2012, Robert Kanney, M.D., noted that he had been treating the claimant for more than 10 years, and he opined that the claimant could sit for 60 minutes at one time, sit for four hours total in an eight-hour day, stand or walk for ten minutes at a time, stand or walk for two hours total in an eight-hour day, requires the ability to shift positions, at will, from sitting, standing, or walking, would need to take unscheduled breaks, could never lift more than 20 pounds, she would likely be absent from work more than four times a month due to her impairments or treatment, and she is not physically capable of working an eight-hour day, five days a week, on a sustained basis.  (Exhibits 5F, 18F). In June 2014, Dr. Kanney noted that in his opinion, the claimant has had these limitations since 2001.  (Exhibit 21F).

> The record reflects significant gaps in the claimant's history of treatment, with most of the medical records being dated prior to the claimant's alleged onset date, or after her date last insured.  Consequently, Dr. Kanney's opinions, regarding the claimant's physical capacity, are without substantial support from the other evidence of record, which obviously renders them less persuasive.  Therefore, the undersigned has given them little weight.

---

[11]     Dr. Kanney has provided opinions on both Sito's physical and mental limitations.  (Tr. 436-437, 623-624, 648-650, 820-822, 824-826.)  However, in her Brief, Sito limits her arguments to the ALJ's analysis of Dr. Kanney's physical opinions.  (Doc. No. 15 at 16-19.)  Thus, the Court will similarly limit its analysis to the opinions on Sito's physical limits.

37

>The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for one reason or another.  Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requests and avoid necessary doctor/patient tension.  While it is difficulty to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case.

(Tr. 662-663.)

The Court finds the ALJ properly weighed and considered Dr. Kanney's opinions.  The ALJ correctly noted Dr. Kanney was a treating source.  (Tr. 662.)  In assigning "little weight" to Dr. Kanney's opinions, the ALJ addressed the consistency and supportability of the opinions, explaining the opinions "depart[] substantially from the rest of the evidence of record."  (Tr. 663.)  She noted the gaps in treatment, particularly the fact the bulk of the treatment occurred either prior to Sito's alleged onset date or after her date last insured.  (Tr. 662.)

The Court acknowledges that, taken alone, it could be an issue whether this discussion satisfied the "good reasons" requirement of the treating physician rule.  However, reading the ALJ decision as a whole, the Court finds the ALJ throughly evaluated the medical evidence and Sito's allegations.  Specifically, the ALJ discussed Sito's testimony, noting Sito reported fibromyalgia, neck and back pain, a foot injury, and diverticulitis.  (Tr. 662.)  Earlier in the decision, the ALJ discussed the medical evidence which occurred between Sito's alleged onset date and her date last insured, including her essentially normal foot x-rays, head CT scan, and colonoscopy.  (Tr. 657-658.)  Within this discussion, the ALJ also noted Sito's lumbar MRI, which was obtained six months following her date last insured.  (Tr. 658.)

Had the ALJ discussed the aforementioned evidence immediately after according "little

38

weight" to Dr. Kanney's opinions, there would be little question the ALJ provided "good reasons" for giving them less than controlling weight.  The fact the ALJ did not analyze the medical evidence for a second time when assessing Dr. Kanney's opinion does not necessitate remand of Sito's case.  *See e.g., Ellis v. Comm'r of Soc. Sec.*, 2015 WL 6444319 at * 15-16 (N.D. Ohio Oct. 23, 2015); *Hanft v. Comm'r of Soc. Sec.*, 2015 WL 5896058 at * 9 (N.D. Ohio Oct. 8, 2015); *Daniels v. Comm'r of Soc. Sec.*, 2014 WL 1304940 at * 4 (N.D. Ohio March 27, 2014) ("There is no magic language that an ALJ must use to show that he or she has considered the factors in 20 CFR § 404.1527.  Rather, the ALJ must set forth his or her supporting reasoning, based on evidence in the record, to allow for meaningful judicial review.")  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).  *See also Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x 171, 173 (6th Cir. 2004 ) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) ).

Further, substantial evidence supports the ALJ's finding Dr. Kanney's opinions were entitled to little weight.  A review of the medical evidence during the relevant period reveals Dr. Kanney treated Sito in June 2008 following her foot injury.  (Tr. 508.)  By August 2008, Sito's injury had "progressed very nicely," though her skin displayed irritation from an antibiotic ointment.  (Tr. 506.)  In September 2008, Dr. Kanney noted Sito was "doing well overall."  (Tr. 505.)  Sito did not return to Dr. Kanney until March 2010, reporting lower back and right elbow

pain. (Tr. 504.) X-rays of Sito's right elbow were overall negative. (Tr. 410.) For the remainder of the relevant period, Sito did not seek additional treatment for her lower back from Dr. Kanney. She did have some abdominal pain and diarrhea in late 2010, but a colonoscopy was essentially normal and her diarrhea resolved. (Tr. 558.)

The remainder of the medical evidence, including Dr. Kanney's opinions, occurred after the September 30, 2011 date last insured. A March 2012 MRI confirmed disc degeneration and spinal stenosis. (Tr. 484.) However, this diagnostic testing occurred, as the ALJ correctly noted, six months after the date last insured. "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2004) (citing *Cornett v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264, n. 6 (6th Cir, 1988) ); *see also Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)(finding evidence obtained after date last insured only minimally probative of claimant's condition prior to date last insured and rejecting claimant's argument that the ALJ's rejection of medical opinion was not supported by substantial evidence).

Sito argues the ALJ's focus "upon sparse treatment is erroneous," as she "reasonably explained the basis for infrequent treatment due to financial difficulties." (Doc. No. 15 at 18.) The Court finds this argument without merit. The ALJ was not required to accept Sito's explanation for her minimal treatment during the relevant period. Moreover, while Sito testified "there was just no way that I could afford to go see a doctor," she also testified that her "husband [made] enough money" for her to stop working. (Tr. 65, 74.)

Sito also asserts Dr. Kanney's treatment before and after the relevant period "provides more than sufficient basis for him to render a well-informed opinion." (Doc. No. 15 at 18.)

40

However, the ALJ did not dispute Dr. Kanney's long treatment history with Sito or his ability to provide an opinion.  (Tr. 662.)  Rather, the ALJ found the limitations provided by Dr. Kanney were inconsistent with the medical evidence.

The Court acknowledges the ALJ inferred Dr. Kanney may have provided his opinion due to sympathy or pressure from Sito.  (Tr. 663.)  While the Court finds this type of reasoning misguided and speculative, the ALJ did provide other "good reasons" to support the rejection of Dr. Kanney's opinion which are supported by substantial evidence.  *See Daniel v. Comm'r of Soc. Sec*., 527 Fed App'x 374, 375 (6th Cir. May 23, 2013)("However, even with the possible sympathy removed from the analysis, there is other substantial evidence to support the ALJ's decision on the treating physician's credibility.")  *See also Martin v. Berryhill*, 2017 WL 1571906 at *4 (E.D. Ky Mar. 30, 2018)("Even assuming the ALJ erred in considering possible sympathy, there is other substantial evidence on the record to support the ALJ's decision to discount Dr. Gooslin's opinion.")

Accordingly, and for all the reasons set forth above, the Court finds the ALJ properly evaluated Dr. Kanney's opinions and provided "good reasons" for affording it little weight.  This argument is without merit.

## C.        Step Two - Physical Impairments

Sito argues the ALJ's rejection of Dr. Kanney's opinion is "particularly harmful in this case, because it contributed to the ALJ's failure to properly evaluated [her] physical impairments at Step Two, with a corresponding failure to include any physical limitations in the RFC."  (Doc. No. 15 at 19, 20.)  She contends "the record shows that onset of [her] impairments began well before her date last insured."  (*Id*. at 18.)  Sito asserts the medical evidence is "consistent with

41

fibromyalgia symptoms and signs, as outlined in SSR 12-2p."  (*Id*.)

The Commissioner maintains the ALJ properly determined Sito had no severe physical impairments.  (Doc. No. 16 at 13.)  She asserts the ALJ evaluated Sito's "physical condition *as it existed as of the date last insured*." (*Id*.)(emphasis in original.)  The Commissioner notes the ALJ considered Sito's minimal treatment for her back pain and the fact Dr. Kanney's treatment notes did not mention fibromyalgia until two years after her date last insured.  (*Id*. at 14, 15.)  The Commissioner concludes since the "ALJ properly explained that prior to the relevant period's expiration [Sito] did not have any severe physical impairments, and therefore the record could not and did not support any functional limitations."  (*Id*. at 17.)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (emphasis added).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR § 404.1521; Social Security Ruling ("S.S.R.") 96–4P, 1996 WL 374187, at *1 (S.S.A. July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms and laboratory findings.  *Id.*

Further, the regulations require "evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment."  S.S.R. 06–03P, 2006 WL 2329939, at *2; 20 CFR 404.1513(a) and 416.913(a).  "[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  SSR 96–4P, 1996 WL 374187, at *1

42

(S.S.A. July 2, 1996).  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings."  SSR 96–4p (footnote omitted).  *See also* 20 C.F.R. §§ 404.1529(b) and 416.929(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, 2017 WL 749185 at * 6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumine-Husseini v. Comm'r of Soc. Sec.*, 2017 WL 655402 at * 8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017).  The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.")  *See also Kavalousky v. Colvin*, 2013 WL 1910433 at * 7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Here, the ALJ determined, at step two, the only physical "medically determinable impairments" suffered by Sito prior to her DLI was obesity.  (Tr. 657.)  The ALJ acknowledged Sito's "history of fibromyalgia," but determined her fibromyalgia did not constitute a "medically determinable impairment" for the following reasons:

> With regard to the claimant's allegations of fibromyalgia, the undersigned has considered SSR 12-2p, which instructs adjudicators how to evaluate fibromyalgia and its corresponding functional limitations.  There are two sections providing criteria for a finding of fibromyalgia as a medically

43

determinable impairment.  In order to find a medically determinable impairment, each of the criteria in the first or second section must be met. Further, the evidence must be consistent with the other objective evidence of record.  The first set of criteria requires a history of widespread pain, at least 11 positive bilateral tender points on examination, both above and below the waist, and evidence that other disorders that could cause the signs or symptoms were excluded.  The second set of criteria are preliminary diagnostic criteria, and require a history of widespread pain, repeated manifestations of six or more fibromyalgia symptoms, and evidence that other disorders which could cause the repeated manifestation of symptoms, signs, or co-occurring conditions were excluded.  According to the criteria outlined in SSR 12-2p, the undersigned does not find that the objective findings of record support a medically determinable impairment of fibromyalgia.

(Tr. 658.)

The Court finds Sito has not carried her burden of establishing fibromyalgia as a medically determinable impairment.  First and foremost, the ALJ correctly noted the criteria for finding fibromyalgia a medically determinable impairment under SSR 12-2p.  *See* SSR 12-2p (S.S.A.), 2012 WL 3104869 (July 25, 2012).  She then concluded there was no objective medical evidence to support a finding of fibromyalgia.  (Tr. 658.)  Sito does not direct this Court's attention to any treatment records or medical evidence which establish she was diagnosed with fibromyalgia prior to her date last insured.  This fact alone provides strong support for the ALJ's conclusion Sito's fibromyalgia did not constitute a "medically determinable impairment" during the relevant period.

Sito, however, argues the ALJ's determination is not supported by substantial evidence because treatment records before her onset date demonstrate she suffered from fibromyalgia. (*See* Doc. No. 15 at 18.)  She notes she attended physical therapy for neck and back pain in 2005, where she had tenderness and decreased range of motion in her cervical and lumbar spine.  (*Id.*) She also discusses her left foot injury in 2008, her reports of back and elbow pain in 2010, and

44

her gastrointestinal problems in November 2010.  (*Id.*)  Sito then, summarily, concludes "these various conditions are consistent with fibromyalgia" as outlined in SSR 12-2p.  (*Id.*)

This argument is not persuasive.  The Agency will find that a person has a medically determinable impairment of fibromyalgia if a physician diagnosed fibromyalgia and provides the evidence described under § II.A or § II.B of the Ruling, and the physician's diagnosis is not inconsistent with the other evidence in the individual's case record.  *Id.*  Under § II. A., the agency "may find that a person has an MDI of FM if he or she has all three of the following":

> 1.  A history of widespread pain-that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted (or that persisted) for at least 3 months' and which "may fluctuate in intensity and may not always be present;"

> 2. "At least 11 positive tender points on physical examination" which must be found in specified locations;[12] and

> 3. Evidence that other physical and mental disorders that could cause the symptoms or signs were excluded, such as "imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclea antibody, thyroid function, and rheumatoid factor)."

*Id.* at *2–3.  Alternatively, a person may be found to have a medically determinable impairment

---

[12]  SSR 12–2p requires a finding of "[a]t least 11 positive tender points [which] must be found bilaterally (on the left and right sides of the body) and both above and below the waist" and which are located on each side of the body.  SSR 12–2p, 2012 WL 3104869 at *3.  The tender points are located at the following 18 sites: Occiput (base of the skull); Low cervical spine (back and side of the neck);  Trapezius muscle (shoulder); Supraspinatus muscle (near the shoulder blade);  Second rib (top of the rib cage near the sternum or breast bone); Lateral epicondyle (outer aspect of the elbow); Gluteal (top of the buttock); Greater trochanter (below the hip); and Inner aspect of the knee.  *Id.*  The Ruling provides that in performing the testing, "the physician should perform digital palpation with an approximate force of 9 pounds (approximately the amount of pressure needed to blanch the thumbnail of the examiner). The physician considers a tender point to be positive if the person experiences any pain when applying this amount of pressure to the site."  *Id*. at § II.A.2.b.

of fibromyalgia under § II.B of SSR 12-2p if he has all three of the following criteria:

> 1. A history of widespread pain as described under § II. A.;
>
> 2. "Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome;" and
>
> 3. Evidence that "other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

*Id.* at 3.  Co-occurring conditions include "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." *Id.* at fn. 10.

Here, Sito does not establish the requirements set forth under § II. A of SSR 12-2p. While Sito did display some tenderness in her cervical spine, lumbar spine, and feet in April 2005 (2 years prior to her alleged onset date), the medical evidence does not provide documentation of the 11 positive tender points required under § II. A.  As for § II.B of SSR 12-2p, while Sito reported pain in her neck, chest, caves, and feet back in 2005 (Tr. 342.), the evidence during the relevant period does not establish "repeated manifestations" of fibromyalgia symptoms which could not have been caused by other conditions.  Indeed, while Sito did experience foot pain in 2008, this was due to an injury which resolved after a few months.  (Tr. 399, 505, 506.)  She briefly received court-ordered mental health counseling in 2009, but made excellent progress and discontinued treatment.  (Tr. 370.)  She indicated some pain in her right elbow, but her x-rays were negative and she did not obtain any further treatment prior to the DLI. (Tr. 504, 410.)  Similarly, she reported abdominal pain in late 2010, but her colonoscopy was negative and her gastrointestinal issues resolved.  (Tr. 503, 558.)  These sparse treatment records,

46

which are devoid of a diagnosis of fibromyalgia, did not establish the criteria under  § II.B of

SSR 12-2p.  Thus, the Court finds the ALJ did not err in her step two evaluation of Sito's

fibromyalgia.

The ALJ also determined Sito's "foot problems; back/neck problems . . . and

diverticulitis" did not constitute medically determinable impairments, reasoning as follows:

> In June 2008, the claimant was taken to the emergency room, complaining
> of left foot pain after her foot was "run over by a car."  (Exhibit 3F at 29).
> The claimant was diagnosed with a contusion/abrasion of the left foot, she
> was placed into a splint, and instructed to ice the foot, rest, and elevate the
> left foot.  (Exhibit 3F at 30).  However, when X-rays of the foot were taken,
> they showed no evidence of fracture or dislocation.  (Exhibit 3F at 31).  In
> January 2011, the claimant was complaining of back pain and she went to
> Fountain City Chiropractic.  (Exhibit 9F).  However, it is not until March
> 2012 (six months after the date last insured) that the claimant had an MRI
> taken of her spine, which showed disk degeneration at L4-5 and L5-S1.
> (Exhibit 7F).  As the MRI was taken after her date last insured, there is no
> indication such impairments existed prior to September 2011.
>
> With regard to the claimant's diverticulitis, in November 2010, the claimant
> had a colonoscopy and the results were essentially normal.  (Exhibits 4F at
> 5, 16F at 4).  Additionally, an ultrasound of the claimant's pelvis in
> December 2010 was normal.  (Exhibit 15F at 4).

(Tr. 657-658.)

Substantial evidence supports the ALJ's determination.  Because Sito's insured status

expired on September 30, 2011, she needed to provide the ALJ with evidence establishing she

was disabled prior to this date.  Sito points to Dr. Kanney's opinions, 2005 physical therapy

notes, a 2008 foot injury, and 2010 gastrointestinal issues to demonstrate the ALJ should have

found her impairments severe.  (Doc. No. 15 at 18.)  However, while Sito intermittently

complained of back and neck pain from 2005 to 2010, neither party directs this Court's attention

to any diagnostic testing confirming arthritis or degenerative changes prior to the DLI.  (*See* Tr.

342, 504.)  Sito also did not receive any consistent treatment for her back and neck pain prior to her DLI.  Additionally, the ALJ correctly notes Sito did not have a lumbar MRI confirming disc degeneration until March 2012, nearly six months after her DLI.  (Tr. 484.)  With regards to Sito's foot injury, treatment records reveal she did not sustain any fractures or dislocation and was "doing well overall" within a few months of the injury.  (Tr. 505, 508.)  There are no treatment records documenting any ongoing treatment for her feet from 2009 – 2011.  Similarly, Sito's abdominal pain and diarrhea resolved within a few months and did not require any ongoing treatment.  (Tr. 567, 568.)  Accordingly, the Court finds the ALJ did not err in determining these conditions were not medically determinable impairments[13] during the relevant time period.

Finally, Sito asserts the ALJ's failure  to find any impairments severe resulted in a "corresponding failure to include any physical limitations in the RFC."  (Doc. No. 15 at 19-20.)  However, Sito does not specify which limitations should have been included in the RFC or otherwise expand upon this argument.  As the ALJ's decision to find no severe physical impairments is supported by substantial evidence, her decision to not find any physical limitations in the RFC is likewise supported by substantial evidence.  Sito's arguments to the contrary are without merit.

**D.        Examining Physician Shamberg**

Sito argues the ALJ erred in failing to "weigh and explain the weight accorded to the opinion of consultative examiner, Dr. Shamberg."  (Doc. No. 15 at 20.)  She asserts while the

---

[13]        The Court acknowledges the ALJ did find one non-severe impairment: obesity. (Tr. 657.)  Sito does not argue the ALJ erred in finding this impairment non-severe.  Thus, the Court will not address the ALJ's analysis of Sito's obesity.

48

RFC includes some mental limitations, "it is unclear how the ALJ reached this determination because she failed to fully address Dr. Shamberg's opinion and indicate what, if any, weight was given." (*Id*. at 22.)  Sito acknowledges the opinion was rendered after the DLI, but argues it "filled evidentiary gaps regarding the extent of [her] mental limitations."  (Doc. No. 17 at 4.)

The Commissioner asserts Sito "fails to distinguish between the ALJ's duty to evaluate a relevant opinion and the duty to evaluate an irrelevant opinion."  (Doc. No. 16 at 19.)  She notes Dr. Shamberg's examination occurred after the DLI, and "as an opinion provided by a one-time consulting psychologist it was not due any particular deference and the ALJ was not required to evaluate in the same manner as an opinion from a treating source."  (*Id*.)  The Commissioner asserts "any failure to provide more analysis is harmless, given that the opinion was provided outside of the relevant period, and did not provide any evidence on [Sito's] condition during the relevant period.  (*Id*. at 22.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c),[14] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id*. "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), id. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly

---

[14]     As noted *supra*, revised versions of these regulations took effect March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), id. § 404.1502, 404.1527(c)(2)." *Id.* Notably, the procedural "good reasons" requirement does not apply to non-treating physicians. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)(explaining that "[i]mportantly ... this reasons giving requirement exists only for § 404.1527(d)(2), and not for the remainder of § 404.1527" and concluding: "[i]n the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give reasons for not accepting their reports").

While the explanation requirement applicable to examining, but non-treating sources, is not as rigorous as the good reasons requirement of the treating physician rule, and ALJ still "must always consider and address medical source opinions [and] [i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996); *see also Puckett v. Colvin*, 2014 WL 1584166 at *9 (N.D. Ohio April 21, 2014) (explaining that, although the ALJ was not required to evaluate opinions of consultative examiners with the same standard of deference as would apply to an opinion of a treating source, he was required to "acknowledge that [the examiners'] opinions contradicted his RFC finding and explain why he did not include their limitations in his determination of Plaintiff's RFC").

However, the Sixth Circuit has held the failure to assign weight to the opinion of a consultative, non-treating source may not constitute reversible error if the ALJ decision is otherwise supported by substantial evidence. *See Dykes ex. rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 468 (6th Cir. 2004) ("if the refusal to even acknowledge the opinion of a treating

50

physician was harmless error in *Heston*, then the ALJ's failure in the present case to discuss thoroughly the opinion of a consultative examiner does not warrant reversal."); *Salter v. Comm'r of Soc. Sec.*, 2015 WL 1880393 at *8 (N.D. Ohio Apr. 24, 2015); *Peshe v. Comm'r of Soc. Sec.*, 2015 WL 6437216 at *12 (N.D. Ohio Oct. 22, 2015). *See also Pasco v. Comm'r of Soc. Sec.*, 137 Fed.Appx. 828, 839 (6th Cir. 2005) (finding an ALJ did not err in failing to discuss a consultative examiner report, when the claimant did not explain how the report would support her disability claim.)

As noted *supra*, Sito underwent a one-time psychological examination with Dr. Shamberg on April 9, 2012.  (Tr. 470.)  This examination was conducted upon the request of her primary care doctor, Dr. Kanney.  (Tr. 449.)  Dr. Shamberg diagnosed Sito with dysthymic disorder, anxiety disorder, a history of adult antisocial behavior, and a history of alcohol abuse in remission.  (Tr. 474.)  He assessed a Global Assessment of Functioning ("GAF") score of 50. (*Id*.)  Dr. Shamberg also provided an opinion based upon his examination of Sito, finding marked to extreme limitations in many areas.  (Tr. 475, 477-479.)

In the decision, the ALJ noted Sito had received two GAF scores of 50, once in February 2006 at a psychiatric evaluation and once in April 2012[15] at a consultative psychological examination.  (Tr. 663.)  The ALJ then afforded "little weight"to these GAF scores, explaining as follows:

> The undersigned has accorded little weight to the GAF scores of record as they are found to have very limited probative value in determining the claimant's actual functional limitations in this matter as they are before the alleged onset date of March 2007, and after the date last insured, in September 2011, as is the majority of the medical record.  Furthermore, the

---

[15]    While the ALJ does not specifically list Dr. Shamberg's name, this GAF score is from his examination.  (Tr. 474.)

> GAF scores seem to have been assessed for different reasons, and while the
> GAF score of 50 in exhibit 2F seems reasonable, given the domestic
> violence, the GAF of 50 in exhibit 10F seems out of proportion to the
> medical evidence of record.  Lastly, the undersigned notes that the
> claimant's presentation at the consultative psychological examination
> seems to be quite different than her presentation at the hearing.

(Tr. 663-664.)  The ALJ did not provide any further discussion of Dr. Shamberg's evaluation or

opinion.

> The ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that,
> through the date last insured, the claimant had the residual functional
> capacity to perform a full range of work at all exertional levels but with the
> following non-exertional limitations: no climbing ladders and the like and
> no exposure to obvious hazards.  The claimant could also: understand, carry
> out and remember simple instructions where the pace of productivity is not
> dictated by an external source over which the claimant has no control such
> as an assembly line or conveyor belt; make judgments on simple work, and
> respond appropriately to usual work situations and changes in a routine
> work setting that is repetitive from day to day with few and expected
> changes; and respond appropriately to supervision, the general public and
> coworkers.

(Tr. 661.)

The Court finds the ALJ's failure to explicitly acknowledge Dr. Shamberg's April 2012

opinion does not constitute reversible error.  While the ALJ acknowledged the existence of a

one-time examination, she did not assign it weight or provide a rationale for rejecting or adopting

the opinion contained therein.  *See Dykes*, 112 Fed.Appx. at 468.  The ALJ did, however, discuss

all of Sito's mental health treatment which occurred during the period of adjudication, as well as

the opinion of Sito's treating physician regarding her mental health limitations.  (Tr. 662-664.)

Thus, reading the decision as a whole, it is clear that, while the decision failed to explicitly

identify Dr. Shamberg's April 2012 opinion, the ALJ nonetheless considered the restrictions set

forth in that opinion and discounted them as inconsistent with the significant gaps in her mental health treatment, her activities of daily living, and her documented improvement as reflected in treatment records.  (*Id*.)  Thus, the Court finds the ALJ implicitly provided reasons for discounting Dr. Shamberg's opinion to the extent it was inconsistent with the RFC.

The Court acknowledges the ALJ's decision may have been more complete if Dr. Shamberg's opinion was explicitly identified.  However, it is significant that Dr. Shamberg's one-time examination did not even occur during the period under adjudication.   As noted *supra*, "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong*, 88 Fed. Appx. at 845; *see also Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987)(finding evidence obtained after date last insured only minimally probative of claimant's condition prior to date last insured and rejecting claimant's argument that the ALJ's rejection of medical opinion was not supported by substantial evidence).  Further, medical evidence after the date last insured is relevant only when the evidence "relates back" to the claimant's limitations prior to the date last insured.  *Walton v. Astrue*, 773 F.Supp.2d 742, 750 (N.D. Ohio 2011) (citation omitted).  Here, Dr. Shamberg specifically states in his "assessments are based on her *current* anxiety and depression."  (Tr. 479.)(emphasis added).

Even if the ALJ erred in failing to explicitly assign weight to Dr. Schonberg's opinion, the error is harmless, as the fundamental question is whether the ALJ decision is supported by substantial evidence.  *See Dykes*, 112 Fed.Appx. at 468.  Here, a review of the medical record indicates the decision is supported by substantial evidence.  Sito's mental health treatment is minimal, consisting of two visits to the Maumee Valley Guidance Center in 2005 and 2006 (prior to the alleged onset date) and a course of court-ordered outpatient therapy in 2009.  (Tr. 361, 366,

53

368, 369, 370.)  She attended therapy sessions from December 2008 – July 2009, and upon

discharge, her prognosis was "good" and she had made "excellent progress."  (Tr. 368, 370.)  In

January 2012, several months after her DLI, Sito indicated she was on an antidepressant but her

depression still "hinder[ed] her functioning."  (Tr. 448.)

Sito argues Dr. Shamberg's opinion "filled evidentiary gaps regarding the extent of

[her] mental limitations."  (Doc. No. 17 at 4.)  This argument is without merit.  Dr. Shamberg

lacked first hand knowledge of Sito's condition prior to the DLI, as the first time he encountered

Sito was nearly seven months after her DLI.  It is unclear how Dr. Shamberg, who had never met

Sito during the period under adjudication, would be able to fill in the "evidentiary gaps" prior to

the DLI.

Lastly, the Court notes the ALJ accounted for Sito's mental impairments by providing

several mental limitations within the RFC.  (Tr. 661.)  Sito asserts the ALJ's failure to consider

Dr. Shamberg's opinion was "prejudicial error" because "it resulted in an incomplete RFC and

hypothetical question to the VE."  (Doc. No. 15 at 22.)  However, Sito does not identify any

additional restrictions she believes should have been incorporated in the RFC or hypothetical,

beyond generally referencing the "marked or extreme limitations" provided by Dr. Shamberg.

(*Id*.)  She also cites no mental health treatment records which would support greater limitations

than those assessed in the RFC or hypothetical.  Rather, she stresses the importance of a one-time

examination from a non-treating source, which occurred after the date last insured.  *See Watson*

*v. Comm'r of Social Security*, 2018 WL 718615 at *13 (S.D. Ohio Feb. 6, 2018)("As the

Commissioner points out, the opinions of one-time examining psychologists are not entitled to

any special deference.")

Therefore, the Court finds the ALJ's failure to explicitly address the opinion of Dr. Shamberg does not constitute a reversible error.  This argument is without merit.[16]

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 28, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

[16]     The Court notes Sito, within one paragraph, argues the ALJ failed to "reconcile her RFC determination" with the Dictionary of Occupational Titles ("DOT") reasoning levels of the jobs provided by the VE.  (Doc. No. 15 at 23.)  However, "there is no precedent that requires the Commissioner to align DOT 'reasoning levels' with RFC classifications." *Monateri v. Comm'r of Soc. Sec.*, 436 Fed App'x 434, 446 (6th Cir. Aug. 11, 2011).  *See also Snow v. Comm'r of Soc. Sec.*, 2015 WL 4507271 at *20 (N.D. Ohio July 24, 2015).  The Court acknowledges the Sixth Circuit has left "open the possibility that an ALJ might reversibly err by failing to inquire about or resolve a conflict between the DOT reasoning levels and a simple tasks-limitation."  *Joyce v. Comm'r of Soc. Sec.*, 662 Fed. App'x 430, 436 (6th Cir. Dec. 5, 2016).  Regardless, Sito has not advanced any argument as to why, in this specific case, the ALJ should have inquired about a potential conflict or even why she was unable to perform the jobs provided by the VE.  Accordingly, the Court finds this argument to be summarily raised and without support.